IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:11-CV-103-FL

LARVETRA FULFORD, MACK MANN,      )
JUSTIN McCOY, CARTER MIDGETTE,    )
TYLAJUWON SHELTON, JARRETT        )
SPENCER, FABIAN SPENCER,          )
NORWOOD SPENCER, NICHOLAS         )
SPENCER, MICHAEL WESTON, and      )
LACY WHITAKER,                    )
                                  )
            Plaintiffs,           )                    ORDER
                                  )
      v.                          )
                                  )
WILSON DAUGHTRY, and DEBBIE       )
DAUGHTRY, individually and doing  )
business as ALLIGATOR RIVER       )
FARMS, LLC,                       )
                                  )
            Defendants.           )

This matter is before the court on defendants' motion for summary judgment (DE 65), and

plaintiffs' cross-motion for partial summary judgment (DE 68). The issues raised have been fully

briefed. For the following reasons, plaintiffs' motion for partial summary judgment is granted in part

and denied in part, and defendants' motion for summary judgment is granted in part and denied in

part.

## STATEMENT OF THE CASE

Plaintiffs filed complaint on June 20, 2011, alleging claims against Alligator River Farms,

LLC, ("Alligator River") arising under the Migrant and Seasonal Agricultural Worker Protection Act

("AWPA"), 29 U.S.C. §§ 1801, et seq., and Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §§ 2000e, et seq. ("Title VII"). Plaintiffs are eleven (11) individuals who worked for defendants in March, 2010.[1]

On August 19, 2011, defendant Alligator River filed motion to dismiss complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). On March 14, 2012, the court denied defendant's motion to dismiss. Plaintiffs filed a motion to file second amended complaint on April 25, 2012, which was granted on June 4, 2012. The second amended complaint, filed June 15, 2012, named the individual defendants, Wilson Daughtry and Debbie Daughtry, doing business as Alligator River Farms, LLC, as the proper defendants in the case. On July 17, 2012, defendants answered the second amended complaint.

The instant motions for summary judgment were filed on September 17, 2012. Plaintiffs moved for partial summary judgment on two of their three claims under AWPA. Defendants moved for summary judgment on all pending claims under both AWPA and Title VII. The court heard oral arguments on the motions December 20, 2012.[2] The court has stayed jury trial and related pre-trial activities pending decision on the summary judgment motions.[3]

## STATEMENT OF FACTS

The relevant undisputed facts are as follows. Plaintiffs, all of whom are black, are citizens of the United States and residents of Hyde County, North Carolina. Defendants are vegetable

---

[1] Ten (10) plaintiffs, not including plaintiff Fabian Spencer, filed charges with the Equal Employment Opportunity Commission ("EEOC") for discrimination and are bringing claims pursuant to Title VII. All eleven (11) plaintiffs are claiming violations of AWPA, however.

[2] The record on summary judgment, as supplemented, includes depositions of the parties, sworn declarations, interrogatories, EEOC documents, and business records from Alligator River, including documentation of wages, hiring and firing, and documents produced in relation to their H-2A program application.

[3] There is also pending on the docket defendants' motion for Rule 11 sanctions filed November 20, 2012, to which plaintiffs' counsel responded in opposition on December 11, 2012. The court elected not to hear arguments on sanctions at the December 20, 2012, hearing. The court will address this motion by separate order.

growers, doing business as Alligator River Farms, LLC, with principal place of business in Hyde

County, North Carolina. Defendant Debbie Daughtry manages bookkeeping and paperwork in the

office, while defendant Wilson Daughtry manages the farm itself. Defendants grow various crops,

including broccoli.

On or about February 1, 2010, defendants applied to the United States Department of Labor

("USDOL") for permission to hire fifty-eight (58) H-2A workers to do field work cultivating and

harvesting defendants' crops.[4] Defendants had used the H-2A program in the past to hire foreign

workers.[5] In accordance with USDOL requirements, they advertised locally and hired qualified

applicants. Defendants, as part of their application with the USDOL, submitted a clearance order[6]

that detailed the nature of the work offered. The clearance order stated, *inter alia*, that all workers

would be paid an hourly rate of $7.27 for planting broccoli. Under the "Job Specifications" section,

the order stated that all crop activities would involve a two-day training period, and after the

completion of which, "workers are to keep up with their fellow workers."

---

[4] The term "H-2A" (presumably named for the statutory subsection in which it is defined) is used to describe an alien "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a). "Agricultural employers who anticipate a labor shortage for temporary or seasonal jobs may petition the government for permission to employ foreign workers on a temporary basis pursuant to the H-2A visa program. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Before the Immigration and Naturalization Service will approve an application, the employers must certify that there is a domestic labor shortage and that employing foreign workers will not adversely affect the wages and working conditions of similarly situated American workers. Id. § 1188(a)(1)." Reyes-Gaona v. North Carolina Growers Ass'n, 250 F.3d 861, 863 n. 1 (4th Cir. 2001).

[5] According to EEOC records, defendants hired about fifty (50) H-2A workers from Mexico each year from 2007 to 2011 to do field work and harvest crops through the USDOL program.

[6] A clearance order, or work contract, must be provided to a non-H-2A worker by the day work commences, and contain all of the job information outlined in 20 C.F.R. § 655.122, including all job qualifications and requirements, wages, and working conditions. 20 C.F.R. § 655.122(q). Note that the circumstances of this litigation took place just as changes in the regulation came into effect. Section 655.104 would have governed at the time the clearance order was issued, February 10, 2010. Section 655.122 took effect beginning March 15, 2010, right before plaintiffs began working for defendants.

3

As a result of advertising and word of mouth, plaintiffs and other job applicants either interviewed at defendants' office or called and were told to report to work at the field on March 25, 2010. On that date, they completed paperwork for employment, were hired by defendants, and received an employee handbook, which contained the clearance order. Plaintiffs did not see any employment poster,[7] although one was posted in an office building employee bulletin board ten (10) miles from the field.

After employee processing was completed, plaintiffs were assigned to plant the broccoli which had been delivered the day before. Plaintiffs and the other workers hired with them were supervised by Gene Fox (the "Fox crew"). The Fox crew was shown a technique for hand-planting broccoli over the two-day training period. Workers on the Fox crew were not given any tools, but some of them brought their own sticks. One plaintiff, Jarrett Spencer, had experience planting vegetables on a commercial farm. During the two-day training period no plaintiff was fired. The Fox crew members had a mix of races and ethnic backgrounds. The Fox crew was secondarily supervised by defendant Wilson Daughtry.

A group of workers, secured through a farm labor contractor named Jose Diaz, worked for and was supervised by Diaz (the "Diaz crew") also in planting the broccoli. The Diaz crew was composed of approximately twenty (20) individuals from Mexico and Guatemala. The workers on the Diaz crew were not H-2A workers (the H-2A workers did not arrive and begin work until after plaintiffs stopped working at Alligator River). Defendant Wilson Daughtry and supervisor Gene Fox referred to the Diaz crew sometimes as the Mexicans or Mexican workers. The workers on the

---

[7] An employment poster, containing certain rights of seasonal agricultural workers, is required to be posted by all employers of seasonal agricultural workers. 29 U.S.C. § 1831(b); see also infra Discussion Part B.1. (describing the posting requirement under AWPA).

4

Diaz crew had agricultural experience. Defendant Wilson Daughtry had used Jose Diaz often to provide extra workers.

The Diaz crew worked planting broccoli in a part of the fields separate from where the Fox crew worked. After the two-day training period, the Fox crew was told by supervisor Gene Fox and defendant Wilson Daughtry that if they did not plant quickly and meet production standards they might or would be fired. It is undisputed that members of the Fox crew were actually fired for not planting quickly enough, including at least one plaintiff. Plaintiffs were negatively compared to the Diaz crew by Gene Fox and defendant Wilson Daughtry.

Members of the Fox crew ranged in age from the early twenties to mid-forties or fifties. Defendants as well as Gene Fox identified the Fox crew as "you boys" on occasion. Plaintiffs were told not to talk with each other while planting, and discouraged by defendant Wilson Daughtry and Gene Fox from working in teams for at least part of the time they were employed at the farm. Defendant Wilson Daughtry and Gene Fox repeatedly told them to work faster.

Defendant Wilson Daughtry communicated to plaintiffs that they may get paid or get paid more if they planted their flats of broccoli plants quickly, although no particular rate of pay per flat was set. Plaintiffs contend they were confused about whether they would be paid by the hour as they were originally told, or by the flat as defendant Wilson Daughtry later mentioned as a possibility. Defendants deny there was any confusion over payment.

The Diaz crew was instructed on where and how to plant by defendant Wilson Daughtry when they arrived. Diaz described his crew's use of tools as follows:

> The day that we arrived, Wilson [Daughtry] brought with him some sticks as tools but not enough for the whole crew and we thus had to provide additional ones. We had some that were better and we used our own sticks each day to plant with less

5

effort. It is more practical, fast, and easy with sticks. Our sticks were made of wood, about two inches wide and almost a foot and a half long.

Diaz Decl. ¶ 7, Oct. 22, 2012. The Diaz crew, supervised by Jose Diaz, had contact with defendant Wilson Daughtry to the extent he checked in on them twice a day. The Diaz crew members were allowed by Diaz to work in teams and to speak with each other. The Diaz crew did a satisfactory job of planting. The Diaz crew was not held to any production standard as to how many flats per day must be planted. The Diaz crew members were paid an hourly rate of $7.25, which was paid in sum to Jose Diaz for dispersion, in addition to Diaz's own fee.

Plaintiffs all were paid the promised hourly rate of $7.27 for their work. Plaintiffs, who had started their two-day training period March 25, 2010, all quit or were fired between March 27, 2010, and March 31, 2010. It is disputed as to precisely how many plaintiffs were discharged for failure to meet the production standard, but the parties agree that at least one plaintiff was fired. The plaintiffs who were not fired chose to quit this work.

## DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that

6

there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but to determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id. at 248-49.

A.    Plaintiffs' AWPA Claims

AWPA has the express purpose "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers . . . and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers." 29 U.S.C. § 1801. At all times relevant, plaintiffs were "seasonal agricultural workers," and defendants were "agricultural employers," as defined in 29 U.S.C. § 1802. Plaintiffs assert that defendant violated three provisions of the AWPA, namely 29 U.S.C. §§ 1831(b), 1831(e), and 1832(c). Plaintiffs seek summary judgment as to the first two provisions, and argue there is a genuine issue of material fact for the jury to decide on the third provision. Defendants seek summary judgment in their favor on all AWPA claims.

1.    Alleged violation of 29 U.S.C. § 1831(b)

Plaintiffs first allege that defendant violated 29 U.S.C. § 1831(b), which imposes the

7

following posting requirements upon employers of seasonal agricultural workers:

> Each farm labor contractor, agricultural employer, and agricultural association which employs any seasonal agricultural worker shall, at the place of employment, post in a conspicuous place a poster provided by the Secretary [of Labor] setting forth the rights and protections afforded such workers under this chapter, including the right of a seasonal agricultural worker to have, upon request, a written statement provided by the farm labor contractor, agricultural employer, or agricultural association, of the information described in subsection (a) of this section. Such employer shall provide, upon request, a written statement of the information described in subsection (a) of this section.[8]

29 U.S.C. § 1831(b). The regulations reiterate that this poster must be posted "at the place of employment in a conspicuous place readily accessible to the worker." 29 C.F.R. § 500.76(d)(1). Interpreting this regulation, the Wage and Hour Administrator wrote an opinion letter clarifying that "the poster is not required to be displayed at each and every field, orchard or grove. However, if workers are hired at the field, posting should be at the field." Op. Wage-Hour Admin. Letter No. 1572 (WH-519) (Nov. 3, 1983).

In this case, it is undisputed that none of the plaintiffs saw a poster about their rights as seasonal agricultural workers. There was not a poster located in the fields where they were hired and worked. The farm did have such a poster, but it was placed in an office building ten (10) miles from

---

[8] Subsection (a)(1) imposes written disclosure requirements as follows: "(A) the place of employment; (B) the wage rates to be paid; (C) the crops and kinds of activities on which the worker may be employed; (D) the period of employment; (E) the transportation and any other employee benefit to be provided, if any, and any costs to be charged for each of them; (F) the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment; (G) the existence of any arrangements with any owner or agent of any establishment in the area of employment under which the farm labor contractor, the agricultural employer, or the agricultural association is to receive a commission or any other benefit resulting from any sales by such establishment of the workers; and (H) whether State workers' compensation insurance is provided, and, if so, the name of the State workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person who must be notified of an injury or death, and the time period within which such notice must be given."

8

the fields where plaintiffs planted broccoli during their employment.[9] The regulation requires placement of the poster in a "conspicuous place readily accessible to the worker." 29 C.F.R. § 500.76(d)(1). There is no genuine issue of fact as to accessibility where no plaintiff saw it. The office building was not "readily accessible" or the "place of employment." 29 C.F.R. § 500.76(d)(1). The workers were "hired in the field" and thus, in accordance with the agency's interpretation of its own regulations, the "posting should be in the field." Therefore, plaintiffs' motion for partial summary judgment as to defendants' violation of 29 U.S.C. § 1831(b) is granted, and defendant's motion is denied as to this claim.

2.     Alleged Violation of 29 U.S.C. § 1831(e)

Plaintiffs next claim that defendants knowingly provided false and misleading information to plaintiffs regarding the terms and conditions of employment, in violation of 29 U.S.C. § 1831(e) and 29 C.F.R. § 500.77.     Section 1831(e) provides: "No farm labor contractor, agricultural employer, or agricultural association shall knowingly provide false or misleading information to any seasonal agricultural worker concerning the terms, conditions, or existence of agricultural employment required to be disclosed by subsection (a), (b), or (c) of this section." 29 U.S.C. § 1831(e). Similarly, 29 C.F.R. § 500.77 states: "No farm labor contractor, agricultural employer or agricultural association shall knowingly provide false or misleading information on the terms, conditions or existence of agricultural employment and housing required to be disclosed by the Act and these regulations to any migrant or seasonal agricultural worker."

---

[9] There were structures close to the workers in the field, such as the port-a-john, equipment shed, and picnic tables, upon which a poster could have been placed. Although some plaintiffs interviewed in the office building, none of them went to the area with the poster, and all workers were hired and filled out paperwork for employment in the field on March 25, 2010.

9

An express purpose of enacting AWPA was to "assure necessary protections for migrant and seasonal agricultural workers," by placing more responsibilities on employers than its statutory predecessor.[10] 29 U.S.C. § 1801. In the area of information disclosure, AWPA protects the rights of agricultural workers to make meaningful choices about where to work.[11] See H.R. Rep. No. 885, 97th Cong., 2d Sess., 14, reprinted in 1982 U.S.C.C.A.N. 4547, 4560 ("The Committee wishes to ensure that workers to the greatest possible extent have full information about where they are going and what the conditions will be when they arrive . . . .") The court notes that 29 U.S.C. § 1831(e) has not been interpreted by the United States Court of Appeals for the Fourth Circuit or any other circuit court.

Plaintiffs argue that the terms of their employment were misleading because the clearance order only required employees to "keep up with fellow workers." Plaintiffs allege they were misled about whether they would be required to plant a certain number of broccoli flats per day. Defendants contend that they counted the number of flats of broccoli planted per day as a measure to determine if workers were keeping up with each other. Defs.' Mem. in Opp'n 7. Defendants discharged at least one of the plaintiffs for failing to meet the production standard.

The standard of production is a term of employment, therefore defendants are not allowed to "knowingly provide . . . misleading information" as to whether plaintiffs would be held to a

---

[10] AWPA succeeded the Farm Labor Contractor Registration Act of 1963 ("FLCRA"), Pub. L. No. 88-582, 78 Stat. 920 (repealed 1983), which was designed to regulate independent contractors who supplied laborers for farms across the nation. AWPA's scope is broader than that of the FLCRA. As noted in Bueno v. Mattner, 829 F.2d 1380 (6th Cir. 1987): "The substantive content of [FLCRA] was incorporated into [AWPA], but the new Act went beyond the old by imposing many of the notice and disclosure duties that had been required only of farm labor contractors on the agricultural employer." Id. at 1382.

[11] See Smith v. Bonds, No. 91-818, 1993 WL 556781, at *13 (E.D.N.C. Sept. 28, 1993) (explaining that "one of the primary purposes of [AWPA] was to provide agricultural workers with information concerning potential employment so they could make an intelligent and informed judgment about whether to accept employment").

certain number of flats per day. See 29 U.S.C. § 1831(e). The facts of this case give rise to an issue that surprisingly has yet to be examined by another court, it appears. Decisions of record memorialize production standards containing an explicit term of measurement. See, e.g., Gaxiola v. Williams Seafood of Arapahoe, Inc., 776 F.Supp.2d 117, 124 (E.D.N.C. 2011) (production standard was to pick three and a half pounds of crab per hour); NAACP, Jefferson Cnty. Branch v. U.S. Sec'y of Labor, 865 F.Supp. 903, 915-16 (D.D.C. 1994) (production standard was to harvest eight tons of sugar cane per day). In this case, however, the production standard of "keep[ing] up with fellow workers" does not instruct as to how that standard will be measured.

Plaintiffs contend that defendants violated AWPA because they required plaintiffs to plant a certain number of flats within a given period, rather than keep up with fellow workers. The overarching goal of the work assignment involving a diverse group of people was to plant a set amount of broccoli plants, deposited at the farm in a determined number of flats, as quickly as possible.

On the undisputed facts of this case, the standard of "keep[ing] up with fellow workers" necessarily draws from the amount of broccoli plants planted under shared environmental conditions. There is no genuine issue of material fact as to what production standard was imposed. Defendants did not violate section 1831(e). Summary judgment in favor of defendants on this ground shall be entered.

Second, plaintiffs maintain that defendant provided false or misleading information concerning the terms and conditions of plaintiffs' compensation. The regulations require disclosure of "[t]he wage rates (including piece rates) to be paid." 29 C.F.R. § 500.76(b)(2). The clearance order at issue in this case provides for an hourly wage of $7.27 for planting and cultivating broccoli.

11

The piece rate box on the form for planting broccoli was left blank, indicating that payment according to a piece rate was not available for planting broccoli. Clearance Order 2. Defendants, who had filled out similar forms under the H-2A program in previous years, included no piece rate for planting and cultivating any crop listed in the clearance order. Piece rates only come into play with harvesting.

For example "Plant and cultivate sweet corn," "Plant and cultivate long green cucumbers," "Plant and cultivate squash," "Plant, cultivate and harvest onions," as well as "Plant and cultivate broccoli," all do not show any piece rate. However, for the work of picking or harvesting row crops, save onions, all show both an hourly rate of $7.27 and a piece rate. For sweet corn, the rate is $0.95 per 11x11 crate, for cucumbers, the piece rate is $0.52 per 24 qt. bucket, and for broccoli bunches, the rate is $2.00 per bushel box. A reduced piece rate is referred to, however, for broccoli crowns. Clearance Order 2.

Once plaintiffs began working, however, defendants allegedly "left plaintiffs with the impression that they were going to be paid on a piece rate, by the flat, for the plants they planted." Second Am. Compl. ¶ 35. Defendants contend that Wilson Daughtry simply told plaintiffs that he might pay them extra money per flat on top of their hourly wages if they planted quickly. Wilson Daughtry Dep. 85 ("[W]e told them . . . if we could figure out a reasonable production type pay, if they worked hard and we could figure out what was fair as far as a production type piece rate that we would consider working toward paying them that way.")

No plaintiff was paid any extra money on top of the hourly rate. It is undisputed that Wilson Daughtry never adopted a hybrid system of payment where hourly wages would be supplemented by meeting a certain production standard. Neither his musing in the field nor the impressions formed

12

by certain plaintiffs amount to terms which should have been set and disclosed in the clearance order. See 29 C.F.R. § 500.76(b)(2).

The facts in evidence do not show a genuine issue as to affirmative representation by defendants or reasonable reliance by plaintiffs that a piece rate would be paid for planting broccoli, unlike in another case where defendants identified an hourly wage of $5.38 in the clearance order and then orally explained to migrant workers that "certain crops workers would be paid a piece rate, but never less than $5.38 per hour." Villalobos v. North Carolina Growers Ass'n, Inc., 252 F.Supp.2d 1, 19 (D. P.R. 2002) (denying defendants' motions for summary judgment). In Villalobos, the defendants also passed out a listing of over twenty-five (25) crops and over thirty (30) specialized tasks with specialized pay rates to employees. Id. There is nothing similar here. The court held that "such multitudinous enumerations of possibilities do not meet the requirements of [AWPA]." Id. Particular concern was expressed about a language barrier in that case. Id. There is no language barrier in this instance, either.

A failure to disclose information in a clearance order may provide a basis for "false and misleading information" liability under AWPA. Vega v. Nourse Farms, Inc., 62 F.Supp.2d 334, 346 (D. Mass. 1999). In Vega, another case involving migrant workers, the court found that defendants' omission from the clearance order that defendants might seek to transfer plaintiffs to another work site, "which defendants mistakenly believed they had a right to do," could be found misleading. Id. It is undisputed that defendants in this case did not have ability to pay a piece rate for planting broccoli as per the clearance order, in substitution of or in addition to the specified hourly rate, unless the clearance order was modified. Mining legislative intent in Vega, the court focused in large part on the need for migrant agricultural workers leaving their permanent places of residence

13

to know where they are going and the protections put in place by Congress to ensure this. Id.. There is no similar issue presented here.

In Cardenas v. Farms, No. 98-1067, 2000 WL 1372848 (S.D. Ind. 2000), another case involving migrant workers, a recruiter was given a written document with terms and conditions of employment, then offered workers "certain terms and conditions of employment that were not listed on the document." Id. at *11. The court, applying the companion requirements for migrant workers, including as here the standard that false or misleading information be knowingly provided, in order to find violation, found the recruiter knowingly provided false information in that case, which constituted a violation of AWPA, only denying summary judgment due to a question of agency relationship. Id.

In this case, the record shows defendant Wilson Daughtry suggested that he might modify the terms of payment in the future. Terms were not agreed upon in the short time that plaintiffs worked for defendants, nor does there appear on the record any meaningful effort to promote any modification. The fact that a two-day training period was followed by mere hours for some plaintiffs working in the fields, planting broccoli, during which time there was keen focus on whether or not plaintiffs were keeping up with their fellow workers, also erodes any reasonable reliance on suggestion of extra money being paid in the future.

Unlike in Villalobos, Vega, or Cardenas, there were no language limitations at issue as between plaintiffs and defendants. In addition to no barrier being raised up here due to different languages being spoken, in this instance no framework for communication endured even for more than a matter of days. Plaintiffs' equilibrium was not challenged by any displacement from their permanent places of residence during their brief terms of employment, nor were they confronted with

14

voluminous employment requirements or rules. The planting operation was a limited one, and the compensation terms for planting broccoli mirrored the terms for planting the other four row crops noticed in the clearance order.

All of these factors are considered in assessing the reasonableness of any reliance on comment concerning a potential future change in payment terms for planting broccoli to a piece rate, during a period when ongoing dialogue as between employer and employees devolved around training of plaintiffs, only one of which had any agricultural experience to draw down on, and assessment of whether they were working effectively to keep up with fellow workers. Where the court has determined the terms of employment not misleading because the clearance order only required employees to "keep up with fellow workers," the significance at the summary judgment stage of plaintiffs' impressions as to a piece rate being paid per flat of broccoli planted in the future is further eroded. Although "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," Anderson, 477 U.S. 242, 255, in order to survive summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Id.. at 252. No jury could reasonably find for plaintiffs on their claim of violation of 29 U.S.C. § 1831(e). Defendants' motion for summary judgment as to this claim is allowed, and plaintiffs' must be denied.

15

3.     Alleged Violation of 29 U.S.C. § 1832(c)

Finally, plaintiffs claim that defendant violated 29 U.S.C. § 1832(c), which provides:

> No farm labor contractor, agricultural employer, or agricultural association shall,
> without justification, violate the terms of any working arrangement made by that
> contractor, employer, or association with any seasonal agricultural worker.

29 U.S.C. § 1832(c). The term "working arrangement" has been interpreted broadly by the Fourth

Circuit where, as here, the employer is taking advantage of a federal program requiring compliance

with all Federal, State, and local employment-related laws. See Donaldson v. U.S. Dep't of Labor,

930 F.2d 339, 342 (4th Cir. 1991). In Donaldson, the "working arrangement" included both the

clearance order created under the similar H-2 program, and USDOL regulations. Id. at 350

(reversing summary judgment for defendants, and holding that the plaintiffs alleged valid claims

under AWPA).

Plaintiffs allege the following bases for this claim: (1) imposing a specific production

standard of flats per day to be planted instead of the production standard of keeping up with fellow

workers in the clearance order; (2) failure to provide tools; (3) discrimination against plaintiff's in

violation of Title VII; and (4) violation of 20 C.F.R. § 655.122(a) by treating local workers

differently from H-2A workers. As discussed above, there is no genuine issue of material fact as to

whether a production standard was imposed, and the court has found defendants have met their

burden on summary judgment. Below, the court finds that defendants' choice to have employees

hand plant broccoli is within their discretion. Therefore, it is not a violation of the working

arrangement for defendants to fail to provide tools to plaintiffs, even though Jose Diaz provided tools

to his own crew of workers. Furthermore, the court also finds below that defendants have met their

burden on summary judgment as to the Title VII claims. Therefore, they cannot provide a basis for

16

violating the working arrangement in this case.

The remaining claim under this section of AWPA is for violating the terms of the H-2A program.[12] The regulations provide in part:

> The employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, or intends to offer, or will provide to H-2A workers. Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H-2A workers.

20 C.F.R. § 655.122(a). Plaintiffs claim that defendants provided preferential treatment to the H-2A workers who arrived later in the planting season. This claim is based upon contested evidence that compares the production and treatment of plaintiffs to H-2A workers. See Nashland Decl. Significantly, defendants' records show that no H-2A worker was fired, but that four workers on the Fox crew were "let go." The H-2A workers did not plant broccoli, but it appears from the records that they picked cucumbers and sweet corn from June 24, 2010, to June 26, 2010. Using basic mathematical formulas, Nashland compares the productivity of the Fox crew planting broccoli on March 27, 2010, with the productivity of the H-2A workers on June 26, 2010, harvesting sweet corn. Nashland found that some H-2A workers fell below the hourly mean of productivity on that single day by more than twenty (20) percent, but they were not let go. In contrast, the workers on the Fox crew that fell below the hourly mean on the day in question by more than fifty (50) percent were let go (plaintiff Jarrett Spencer and Randy Spruill). Also "let go" that day was plaintiff Fabian

---

[12] Note that initially plaintiffs believed that the members of the Diaz crew were H-2A workers, and it only came to light later in discovery that those workers were not hired through the H-2A program. This clarification was made on November 9, 2012, in the form of a notice to the court (DE 76). It is now clear that defendants did not employ H-2A workers at the same time they employed plaintiffs. Plaintiffs all quit or were fired before H-2A workers began their employment for defendants in or after April 2010.

17

Spencer,[13] who performed above average and Torrence Spencer, who worked fifteen (15) percent slower than average. Nashland's analysis shows that the H-2A workers, at least on that single day, worked much closer to the hourly mean than workers on the Fox crew. Compare Nashland Decl. Ex. 5 (reflecting that H-2A workers performed at between seventy-five (75) and one hundred and twenty-eight (128) percent of their hourly mean), with id. at Ex. 3 (showing that the Fox crew performed at between forty-two (42) and one hundred and forty-seven (147) percent of their hourly mean).

Defendants are correct to challenge the Nashland declaration and exhibits as improper expert testimony. However, even assuming, *arguendo*, that this evidence is proper for the court to consider, plaintiffs' claim would still be unable to survive summary judgment. These isolated comparisons of raw data, with no explanation as to why any particular worker was "let go" or any reason someone might have performed below average,[14] do not raise a "genuine" issue as to whether plaintiffs were subjected to different working conditions than the latter-employed H-2A workers, who performed completely different tasks. This evidence is simply too little, too late to save plaintiffs' working arrangement claim pursuant to AWPA. Therefore, the court grants summary judgment to defendants on this claim as well. For this claim, as well as the Title VII claims discussed below, plaintiffs did not move for summary judgment. The court turns its attention below to the remaining part of defendants' motion.

B.      Plaintiffs' Title VII Claims

---

[13] Even though the business record indicates that plaintiff Fabian Spencer was let go, his deposition indicates that he walked off the field, effectively quitting, at the end of the day on March 27, 2010.

[14] For example, Gene Fox told plaintiff Mack Mann his production was not up to par, and Mann explained that he had a hip replacement. Therefore, Fox allowed him to keep working, and Mann turned out to be one of the faster planters in the Fox Crew. Mann Dep. 50-51.

18

Plaintiffs also bring employment discrimination claims against defendants under Title VII.[15] Specifically, plaintiffs complain that defendants subjected them to discrimination on the basis of their national origin, the United States, in the form of disparate treatment and a hostile work environment. Title VII provides in relevant part that it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1).

1.     Disparate Treatment

A plaintiff pursuing a Title VII claim may either offer direct evidence of discrimination or use the burden-shifting framework that was adopted by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Plaintiffs seek to use the latter approach. Therefore, in order to plead a case of disparate treatment sufficient to withstand a Rule 12(b)(6) motion, plaintiffs must show: (1) that they are members of a protected class; (2) whose job performance was satisfactory; (3) that they were subjected to adverse employment action; and (4) that similarly situated employees outside their class received more favorable treatment. Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). Of course, "the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 286 (4th Cir. 2004).

Turning first to the fourth element, the court finds that the plaintiffs have failed to show that the Diaz crew were similarly situated to plaintiffs. See Holland, 487 F.3d at 214. The Diaz crew

---

[15] Only ten (10) of the eleven (11) plaintiffs assert a Title VII claim. As noted, plaintiff Fabian Spencer does not.

worked directly under Diaz's supervision and were experienced workers. Plaintiffs did not have any experience planting broccoli, and only one of them had worked on a farm previously. Furthermore, the Diaz crew worked on a different schedule than plaintiffs. Diaz collected their payments collectively from defendants, and distributed salary to his crew. Defendants did not go over and correct planting or make the Diaz crew re-plant broccoli as they did with plaintiffs. The sub-contractor relationship between Diaz and defendants differentiated the Diaz crew from plaintiffs to such an extent that they simply were not "similarly situated." See, e.g., Nowlin v. Lake City, 2012 WL 831498, at *10 (D.S.C. Jan. 25, 2012) (recognizing that a part time independent contractor and full time employee hold different positions, and are not, therefore, similarly situated); Ahern v. Shinseki, 2009 WL 1615402, at *2 (D.R.I. June 9, 2009) (explaining that employees could not be compared to independent contractors where they have different pay and benefit packages); Barbour v. United Beechcraft, Inc., 1998 WL 803417, at *6 (N.D.Ill. Nov. 10, 1998) (finding that an employee and independent contractor were not similarly situated).

Plaintiffs argue that Diaz's crew were paid similar wages, worked in the same fields and performed the same job as plaintiffs. However, the court finds based upon the record that the differences between the way the two groups of workers were managed, one primarily by Gene Fox and the other by an independent contractor, is sufficient to prevent plaintiffs from showing a *prima facie* case of disparate treatment under Title VII. For the reasons stated above, the court finds that plaintiffs cannot prove disparate treatment in violation of Title VII. Therefore, defendants' motion as to this part is granted.

2.    Hostile Work Environment

Plaintiffs next allege that defendants created a hostile work environment, in violation of Title

20

VII. To demonstrate a national origin-based hostile work environment claim, plaintiffs must show that they were the subject of conduct that was: (1) unwelcome, (2) based on national origin, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to their employer. Pueschel v. Peters, 577 F.3d 558, 564-65 (4th Cir. 2009).

Turning first to the third requirement for a hostile work environment claim, it is conduct "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Pueschel, 577 F.3d at 565. To establish this element, plaintiffs must show "that a reasonable person in [plaintiffs'] position would have found the environment objectively hostile or abusive." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). In determining whether plaintiffs have shown conduct that is sufficiently severe or pervasive, the court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Id.

Considering the totality of the circumstances, the court finds that the conduct in this case was not sufficiently severe or pervasive to alter the conditions of plaintiffs' employment and create an abusive atmosphere. Defendant Wilson Daughtry repeatedly called members of the Fox crew "you boys,"[16] and negatively compared them with the Diaz crew, which he referred to as "the Mexicans." This type of language has been found to be objectively humiliating in combination with other types

---

[16] Slurs such as this one have been found to show direct evidence of discrimination. See, e.g., Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (holding that referring to employees as "boy" could be evidence of discriminatory intent when considered with factors "including context, inflection, tone of voice, local custom, and historical usage," and reversing the Court of Appeals decision that the use of "boy" alone was not direct evidence of discrimination); White v. BFI Waste Services, LLC, 375 F.3d 288, 297 (4th Cir. 2004) (recognizing that "boy" was one term of many that could create triable issue of fact on hostile work environment claims when used against employees).

of slurs. See White v. BFI Waste Services, LLC, 375 F.3d 288, 297 (4th Cir. 2004) (reversing summary judgment for defendants where plaintiff was called "boy, jigaboo, nigger, porch monkey, Mighty Joe Young, and Zulu warrior"). In this case the severity of the term "you boys" was not as threatening and humiliating as some of the terms used in White, but the frequency of use is on par with that case. Compare id. (recognizing these terms were "just the way [the supervisors] speak to you" and that "supervisors used the term 'boy' on a daily basis"), with Nicholas Spencer Dep. 39, 54 (remarking that the Fox crew members were referred to as "you boys" or "boy" as part of supervisory work instructions, for example "you boys aren't working fast enough" or "you boys need to speed up," on a daily basis). See also Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 335-37 (4th Cir. 2010) (finding grounds on summary judgment for plaintiff's sex-based hostile work environment claim where "[s]exist comments were pervasive" and made to plaintiff or in her presence, but denying grounds for her race-based hostile work environment claim where only three racist comments were made over the course of five months, none of which were directed at plaintiff). White is also distinct from this case because the term "boy" in that case was used "to refer only to black employees, and not to white ones." White, 375 F.3d at 297. In this case, there were non-black members of the Fox crew, and defendant Wilson Daughtry referred to them all collectively as "you boys," without distinguishing on the basis of nationality or race.

Second, plaintiffs allege that the conduct of defendants unreasonably interfered with the plaintiffs' work performance. Plaintiffs, unlike the Diaz crew, were not provided with tools, and were prohibited from speaking to each other and working in groups. Further, plaintiffs were required to start work earlier than the Diaz crew, to re-do their work, and to keep count of the flats of broccoli planted. See supra Discussion Part C.1 (finding that plaintiffs and the Diaz crew were not "similarly

22

situated"). However, plaintiffs were also separately supervised. Diaz provided the tools his crew used, while defendant Wilson Daughtry showed the Fox crew how to plant with their hands. Plaintiffs were less experienced in agricultural work than the Diaz crew and so they naturally required more supervision and training.

While plaintiffs contend that they should have been provided with tools instead of hand planting as they were trained, "no court sits to arbitrate mere differences of opinion between employees and their supervisors." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 (4th Cir. 2000) (affirming summary judgment in favor of defendants on Title VII race-based discrimination claims). Defendants' decisions to have plaintiffs hand plant broccoli quickly, quietly and individually, during set hours and according to a standard that may require re-doing inadequate work does not rise to the level of unreasonable interference with work performance in violation of Title VII. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) ("Actions taken against a plaintiff in response to concerns regarding performance fall short of alleging an abusive working environment.").[17] Taking together the actions and words of defendants, the totality of the circumstances in this case were not severe enough to "alter the conditions of employment and create an abusive atmosphere." See Pueschel, 577 F.3d at 565.

Therefore, the court finds that defendants are entitled to summary judgment on plaintiffs' claim, pursuant to Title VII, under a hostile work environment theory. Defendants' motion as to this part is granted.

---

[17] In contrast, the types of behavior that may rise to the level of hostile work environment include combining verbal slurs with pranks, such as tampering with an employee's workplace and equipment. See EEOC v. Xerxes Corp., 639 F.3d 658, 670-71 (4th Cir. 2011) (finding genuine issue of material fact where, in addition to racial slurs, there were numerous pranks by co-workers that may have been racially motivated, such as "turning the lights off in the bathroom and throwing wet paper towels at [one employee], placing gel on the doorknob in the bathroom so that he could not open the door, tampering with his toolbox lock, and hiding his toolbox").

23

## CONCLUSION

For the foregoing reasons, plaintiffs' partial motion for summary judgment is GRANTED in part and DENIED in part in accordance with this order. Defendants' motion for summary judgment is also GRANTED in part and DENIED in part in accordance with this order. Plaintiffs have prevailed on their claim of violation of 29 U.S.C. § 1831(b), which imposes posting requirements upon employers of seasonal agricultural workers. Defendants have prevailed on motion seeking judgment in their favor on all remaining claims. The parties shall confer and submit supplemental joint report offering suggestions as to the court's determination of relief due plaintiffs on their prevailing claim within twenty-one (21) days from entry of this order. Should the parties be unable to agree to a joint report on damages, each party may submit a separate report briefing the same also within twenty-one (21) days from entry of this order.

SO ORDERED, this the $\underline{6}$ day of June, 2013.

LOUISE W. FLANAGAN
United States District Judge